# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : CASE NO.: 3:18-CR-00048 (VAB) |
| Plaintiff, | : |
| v. | : |
| | : |
| | : |
| ROBERT V. MATTHEWS, | : July 17, 2023 |
| | : |
| Defendant. | : |

## DEFENDANT'S SENTENCING MEMORANDUM

**Introduction**

Bob Matthews stands before the Court, a sixty-five-year-old man, humbled by life's circumstances and shamed by his own misdeeds. Bob's life has been a story of rags to riches, and back to rags. Throughout his life, Bob has always dreamed big and lived as if the universe would shine favor on him at every turn, no matter how dark the clouds. Obviously, that full-sails-ahead approach to life has not ended well for Bob. He now finds himself a man who dreamed big, gambled bigger, took for himself what was not his, and, as a result, has lost nearly everything—his family, his home, his life's savings, and now, likely, a portion of his remaining years.

Yet Bob has responded to this self-made calamity with tell-tale grace and charity. He continues to believe he has a purpose in the world that must be fulfilled; he spends much of his time helping others and pursuing charitable ventures; and he reflects on his downfall with a sense of sanguine spirituality—realizing, as he told the Probation Officer, that it took losing everything for him to appreciate the true gifts the world had afforded him and what it means to live a truly "rich" life.

Bob now stands before the Court taking full responsibility for his actions, and humbly hoping the Court will judge him based on the entirety of his life, not solely based on the quantitative harm he caused the victims in this case.

**Background**

**1. Bob's Upbringing**

Bob was born the fourth of six children. And, his family has its own unique story of unhappiness. Bob's father was an alcoholic who mostly lived apart from the family. Bob's mother worked mightily to hold the family together and make ends meet. Despite Bob's distance from his father, he was the child who sought madly to shine in his father's eye, but sadly could do-no-right by his father, no matter how hard he tried. Thus, at age 16, when Bob's father "retired" and returned to the family home, Bob could live there no more and moved out. The feelings of rejection and inadequacy that Bob suffered from as youth seem to have animated him throughout his life, explaining much of his lifelong desire to impress those around him with the outward trappings of success. In many ways, even at age 65, Bob remains the little boy who tries to please and receive approval from all those around him.

While Bob self-reports a story of middle-class normalcy, his family members tell a different story. Whereas Bob explains his father's absences from the family home as due to some sort of secret work for the U.S. government, his sisters, in their letters, paint a picture of their father's alcoholism and profound dysfunction. They also anecdotally describe a level of poverty that led family members to draw drinking water from nearby streams and re-use plastic bread bags to "waterproof" their boots in winter.

After leaving home, Bob earned his high school degree at Cape Cod Technical High School, and then an associate degree in business administration from Cape Code Community College. Bob next traveled west and south, where he worked a variety of blue collar jobs, including working for a mining company in Wyoming. Bob then returned to Massachusetts and enrolled in UMASS for a year, while working nights at a state school for mentally disabled children. At about that time, one of Bob's older brothers died from a then-mysterious form of leukemia.

It was then that Bob discovered real estate as his calling.

### 2. Bob's Life in Real Estate

By about age 21, Bob had saved $2,000 (which for some strange reason he kept hidden under a frozen turkey in his freezer). Bob used this money to buy a dilapidated four-family home in Belchertown, Massachusetts, with one of his brothers. He and his brother then rehabbed the house themselves, turning it into a glitzy revenue-generating rental. Bob next moved to Waterbury, Connecticut, where he began building his real estate and business ventures in earnest. Thus began Bob's real estate empire.

Suffice it to say, Bob was an extremely successful entrepreneur. He dreamed big, took huge chances expecting always fate to shine on him, and—for a long time—fate did in fact shine favor on him. Bob reports an all-time high net-worth of hundreds of millions of dollars, mainly in real estate holdings. During high times, he owned lavish homes, expensive cars, and lived the life of the rich and famous. This included entertaining celebrities and politicians at big-ticket charitable fundraisers, as shown in the picture taken in Bob's home in 1999, below:



But then came the 2008. The market crash and corresponding credit crunch had a devastating impact on Bob's expansive—and highly leveraged—real estate ventures. Suffice it to say, Bob lost everything. As discussed below, one of the main contributors to his financial demise in 2009 was the Palm House Hotel—which over time has proven to be Bob's great white whale.

### 3. Bob's Health

While Bob presents as a vibrant, energetic, optimistic man of 65, he has had more than his share of serious health issues. Most notably, in 1999, Bob was struck with a rare respiratory illness that caused him to be airlifted to the Mass General Hospital, where he lapsed into a coma and was given last rites. (Medical records pertaining to this illness have been provided to Probation and government.) After 45 days in the hospital and eight months of rehabilitation,

Bob defied all odds and—consistent with his irrepressible faith—regained his ability to move without a wheelchair.  Then, rather miraculously, Bob was able to progress even further and has since resumed a near-normal physical regime.  But Bob still suffers from Adult Respiratory Syndrome, which has resulted in reduced lung functioning and, from time-to-time, causes him breathing issues.

Bob also suffers from a number of other ailments.  Most recently he underwent cataract surgery, which led to a detached retina and the need for follow-on surgery and treatment.  The eye that underwent surgery has since recovered, but Bob still needs surgery for his remaining eye.  Obviously, Bob would prefer to obtain this surgery before serving any jail sentence, particularly given the complications the occurred with his first surgery.  (He is scheduled to meet with his eye surgeon on July 20.)

Beyond his eye issues, Bob has a number of health problems that will be addressed only briefly here, but discussed further at sentencing.  These ailments include: previously suffering from diverticulitis, which led to a portion of his colon being removed and resultant resection complications; irritable bowel syndrome; unusually high levels of estradiol (estrogen); and an unspecified blood coagulation disorder.

Bob also suffers from serious bouts of anxiety.  After his arrest, Bob suffered from suicidal ideation and heavily self-medicated with pills and alcohol.  Bob's condition was exacerbated by the fact that he was incarcerated in a local Florida prison after his initial arrest, which lasted about a week because of the government's initial request for pretrial detention.  His mental health issues later resurfaced in full when the government filed a superseding indictment charging his then-wife with a variety of crimes that he was responsible for committing.  Since

then, Bob has been treated with a variety of anxiety medications. Over the past several months Bob's anxiety has re-peaked and he remains medicated.

Needless to say, Bob's legal circumstances did not create a formula for marital bliss and, ultimately, led to Bob's separation and divorce from his wife of twenty-six years. Bob, however, continues to maintain a positive relationship with his now ex-wife, and the two remain friends and speak frequently. As discussed below, Bob remains a large presence in his daughters' lives.

### 4. Bob's Spirituality and Service

Throughout his career, Bob has been generous with charities, writing checks, sponsoring fundraisers, and helping those around him. But since the collapse of his real estate empire and this criminal case, Bob's commitment has become more personal and profound. As can be seen from the many letters submitted to the Court, Bob is engaged in a wide range of community services, and is a powerfully positive influence in many people's lives. Without rehashing each of the letters individually, suffice it to say Bob has touched many people over the years, motivated by genuine kindness and generosity.

Further, consistent with Bob's boundless enthusiasm and optimism, he has been working closely with a Florida medical center that has developed a novel treatment for patients suffering from brain-related illnesses. Over the past few years, Bob has worked with the founder to convert his important medical breakthrough into a viable business venture. But more than that, Bob sees the treatment center as an opportunity to help disadvantaged persons obtain life-changing treatment. Thus, the only "payment" Bob has received for his work with the center has been the promise that Bob will be able to identify needy patients and bring them to the center for

free treatment. This is reflected in the letters submitted to the Court, including one from the son of a patient who recently received such life-changing treatment.

In short, Bob's optimism, enthusiasm, and self-help orientation has led him to help many people over the years, especially since he hit rock bottom during this criminal case. Bob's actions are particularly telling in regard to Bob's personality and character, given that, over this same period of time, Bob himself has lived hand-to-mouth, not always knowing where his next meal might come from or how long he may be able to shelter in his current accommodations.

### 5. Family

As noted above, Bob is recently divorced. Beyond that, this case has had a substantial impact on his family, particularly his daughters. Both daughters have submitted letters to the Court, which defy summary and must speak for themselves. However, Bob's current circumstances have had an impact on his daughters beyond what they have chosen to describe in written word, but which they may be brave enough to speak to at sentencing. Suffice it to say, Bob's circumstances have hit his family hard and this, alone, has caused him indelible grief and pain. Yet, tellingly, Bob remains an ever-positive and inspiring force in his daughters' lives, as reflected in their notes.

### 6. Offense Conduct

As noted above, the Palm House Hotel has proven to be Bob's great white whale. Bob initially purchased the Palm House in 2006, with the dream of converting the dilapidated but superbly located structure into a world-class resort, rivaling luxury retreats such as Mar-a-Largo. Bob bought the hotel with $10 million in cash and $19 million in private financing. He then invested approximately $8 million in the property before 2008, when the market collapsed.

After the collapse, Bob's financers sought to call their loan, which was a non-recourse loan creating no personal liability for Bob.  Bob, however, desperately wanted to keep the property and realize his dream of a grand hotel; therefore, he agreed to a new bridge loan from the lenders, this time guarantying the loan personally.  Then, the fates failed to shine on Bob and he failed to find replacement funding, resulting in the lender calling the note and ruining Bob financially.

Even though the Palm House loomed large in Bob's 2008-2009 financial downfall, he continued to obsess and dream of recovering the hotel and converting it into a grand resort.  Thus, even after the hotel changed ownership, he continued to operate behind the scenes, trying to play a role in the hotel's renovation.  And, Bob continued to search for ways to buy the hotel back and realize his dream.

At this point, enter Bob Walsh and his EB-5 investor company, South Atlantic Regional Center, or SARC.  To make a long story short, in 2013 Bob arranged to buy the entity that owned the Palm House, using EB-5 investor money raised by SARC to make payments on a $27.5 million note issued to fund the sale.  While Bob participated in SARC's fund-raising efforts, these efforts were led by Joe Walsh, who collected and distributed the money provided by the investors.[1]

---

[1] Walsh and SARC were also responsible for ensuring that the investors had sufficient net worth to risk the investment opportunity, and required all of the investors to certify and document that they could afford to lose their investment entirely.  Walsh's PPM included the following disclosure:

All totaled, SARC distributed about $30 million to the account controlled by Bob and to be used for renovating the hotel.  Indisputably, and according to a civil fraud suit filed by the SEC in Florida, Walsh himself stole over $8 million of funds obtained from the EB-5 investors, separate and apart from the funds diverted by Bob—a crime for which Walsh has never been charged.  Walsh, who apparently resides outside the U.S., is liable personally for an $18 million SEC judgment as a result of his fraud; similarly, SARC is liable a $65 million judgment.  None of these funds have been recovered from Walsh or SARC.

In any event, the funds distributed for the hotel project were controlled by Bob and those working for him.  To put it plainly, Bob was irresponsible with how he used these funds, diverting a portion to buy his old house in Connecticut out of foreclosure, using other funds to pay personal expenses, and using other funds to buy assets for the hotel project—such as a boat named after the hotel's nightclub, the Alibi—but putting these assets in the name of entities controlled by him.  Further, while under the terms of the purchase agreement for the Palm House

---

**RISKS RELATED TO THIS OFFERING**

**No Assurance of Liquidity; Restrictions on Transfer**

There is currently no market for the Units, and a market in the Units is not expected to develop in the future. The Units are not redeemable and cannot be assigned; transferred; pledged; encumbered or otherwise disposed of without the consent of the General Partner and in compliance with applicable provisions of the Partnership Agreement and applicable securities laws. As a result, purchasers must bear the economic risk of their investments for the life of the Partnership. A purchase of Units should be considered only by sophisticated and accredited Investors financially able to maintain their investment and who can afford to lose all or a substantial part of their investment.

Transferability of the Units is restricted and Investors will not be able to liquidate their investment in the event of an emergency. Additionally, the Units may not be readily acceptable as collateral for loans (to the extent permitted by the Partnership Agreement). Accordingly, purchase of the Units must be considered a long-term, illiquid investment.

SARC's subscription agreement also required potential investors to provide proof they could afford to lose the entirety of their investment.  This, of course, is *not* to say that the investors were responsible for their investment losses under the circumstances or that Bob did not participate in fraud.  Rather, these circumstances are relevant to the issue whether the investors were "vulnerable" victims, and whether such circumstances, if they exist, were known to Bob at the time.

Bob was owed approximately $2.2 million in fees that he never collected, it cannot be said that any of the funds Bob diverted for his personal benefit were accounted for as payment towards such fees.  In the end, as a result of the diversions of funds by Bob (and Walsh), Bob was unable to pay the hotel's creditors and the entity he controlled which owned the hotel went bankrupt—as did Bob personally.

Bob accepts full responsibility for what he did—which was fraudulent and criminal.  But it should be clear that Bob did *not* act with intent to take the investors' money and run, like Walsh.  As demonstrated by his long history with the Palm House, Bob fervently sought to succeed with the project, hoping and expecting to earn rich profits for everyone involved.  Obviously, Bob was wholly irresponsible with how he used the investors' funds, treating their money as his own and manically expecting everything to work out in the end.  But it must be remembered that the scheme spun by Bob not only caused the investors to lose roughly half their investments (see below), but led to Bob's own final financial ruin.  Thus Bob—true to his full-sails-to-the-wind approach to life and finances—set a course that ultimately caused his own financial ruin as well as loss of the investors' money.

As post-script, it should be noted that, during the bankruptcy proceedings the hotel was sold for about $40 million to a new investor.  Likewise, other assets, such as the boat, were liquidated and distributed to creditors.  Even though the EB-5 investors did not have a direct, secured interest in the hotel, the bankruptcy court treated the EB-5 creditors as if they had an interest in the bankrupt entity, canceled the debt supposedly owed to the prior owner who held the note on the property, and distributed a significant portion of the bankruptcy proceeds to the EB-5 investors, directly and through the SEC.  All totaled, the EB-5 investors have received over $18 million of their original $30.5 million investment from the bankruptcy and SEC (which

received funds from the bankruptcy). They have also recovered an undisclosed amount of damages from other parties (including a major bank), which they obtained in confidential settlements that are not available to the defense but must be taken into consideration by the Court when determining restitution. Of significant note, during his personal bankruptcy proceedings, Bob agreed to forego 25% of his portion of the proceeds that would have been due to him under the homestead exemption, explicitly so these funds could be distributed to the EB-5 investors.

Finally, in regard to the tax evasion counts, Bob undeniably had substantial outstanding tax obligations from tax years 2005 and 2007—before he lost everything in the 2008 crash. After that, Bob did in fact take steps to prevent his assets from being seized by the IRS as payment for back-taxes. Yet, the vast bulk of the assets that Bob shielded from recovery by the IRS were the very same assets that Bob obtained as a result of the EB-5 investor scheme. *See* PSR 42-46, 48-51, 53-57. Thus, the tax evasion is largely a by-product of the EB-5 investor fraud scheme, and it would be odd to punish Bob *both* for illegally obtaining funds from investors *and* for not promptly providing all of his ill-gotten gains to the IRS. At bottom, the issue of the ill-gotten funds should (and does) drive the sentencing considerations in this case.

**Sentencing**

　　**1. Sentencing Guidelines**

The Pre-Sentence Report (PSR) calculates Bob's adjusted offense level as 39, prior to the three-level reduction for acceptance of responsibility. But this calculation is based on a "loss" amount of more than $25 million (2B1.1(b)(1)(L)) (PSR 74); and enhancements based on the distribution of bank funds in excess of $1 million (2b1.1(b)(17)(A)) (PSR 74) and presence of vulnerable victims (3A1.1(b)(1)) (PSR 76). However, none of these adjustments is reasonable or correct.

First, while the guidelines generally calculate loss according actual or intended loss, the guidelines allow for a credit against loss "[i]n a case involving collateral pledged or otherwise provided by the defendant." In such circumstances, "the amount the victim has recovered at the time of sentencing from disposition of the collateral" must be credited against the loss amount. 2B1.1, note 2(E)(ii). The reason behind this credit-against-loss provision is clear: where a victim is given an interest in property as part of a fraudulent scheme, the victim cannot be said to have been deprived of the value of the property—only the balance of the monies owed. Here, the Palm House hotel was sold during bankruptcy proceedings for $40 million (in excess of the total EB-5 investment amount). Moreover, the bankruptcy judge treated the EB-5 investors as creditors of the entity that owned the hotel, and distributed to them (directly and through the SEC) over $18 million. Thus, the EB-5 investors received the benefit of the sale of the property at the core of their investment, similar to if they had a secured interest in the property. Given the amount recovered by the EB-5 investors as a result of the sale of the property at the core of the fraud scheme, the total loss amount should be determined to be $11.7 million, thus reducing Bob's offense level by two.

Second, it would make no sense—and be legally wrong—to apply a two-level enhancement under 2b1.1(b)(17)(A). That enhancement applies where "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." Here, the only "receipts" obtained from a financial institution as a result of the offense was the Connecticut property that Bob's surrogate bought from a bank during a foreclosure auction. Yet, the government concedes that the bank suffered *no loss* as a result of this sale. To the contrary, the bank received *more money* as a result of Bob's scheme because, absent Bob's bids on the property, the property would have been sold to a *lower bidder*. Ironically, Bob asked

*two* surrogates to bid against each other for the property, even further driving up the price of the asset. Thus, it would be nonsensical to apply this enhancement here, because, as the government concedes, no financial institution suffered any loss as a result of the scheme—indeed, quite the opposite.

Moreover, based on information and belief, neither the Court nor Probation applied this enhancement to the guidelines calculation of the person who served as the surrogate and successfully obtained the property from the bank during auction. And that result was legally correct. In *United States v. Huggins*, 844 F.3d 118 (2d Cir. 2016), the Second Circuit held that this enhancement does not apply where a bank merely "acted as little more than a conduit of funds *as opposed to being the victim who lost funds as a result of the fraud*." *Id.* at 123 (emphasis added); *see also id.* ("Indeed, no case in this Circuit has applied this enhancement where a financial institution did not suffer some type of loss or liability") (citing cases). Indeed, this guidelines enhancement was originally drafted for the purpose of promoting the security of financial institutions, and to punish those who potentially placed such institutions at risk. *Id.* at 123. Yet, here, the exact opposite happened—the bank was put in a better and more secure position as a result of the fraud. Thus, as a matter of law and fairness, this enhancement does not, and should not, apply. *See id.; United States v. Muho*, 978 F.3d 1212, 1221 (11th Cir. 2020) ("financial institution must have been *victimized* by the offense conduct") (emphasis original).

Third, section 3A1.1(b) provides for a two-level enhancement "If the defendant *knew or should have known* that a victim of the offense was a vulnerable victim" (emphasis added). A "vulnerable victim" is one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." 3A1.1(b), note 2. The Second Circuit has repeatedly held that victims cannot be considered vulnerable based on broad

generalizations based on class membership. *See United States v. McCall*, 174 F.3d 47, 51 (2d Cir. 1998) (generalized information that victims elderly or pass-book accountholders could "not be a basis for a vulnerability finding" because "none of these characteristics alone demonstrate[d] a particular vulnerability"); *United States v. Dupre,* 462 F.3d 131, 145 (2d Cir. 2006) (membership in a religious group, standing alone, did not make victims vulnerable "because the inquiry explores individual attributes, broad generalizations about victims based on their membership in a class are discouraged.") (quoting *United States v. Crispo*, 306 F.3d 71, 84 (2d Cir. 2002)).

When determining whether this enhancement applies, the Court must focus on "the individual victims' *ability to avoid the crime* rather than their vulnerability relative to other potential victims of the same crime." *McCall*, 174 F.3d at 51 (emphasis added). In short, "'where a very substantial portion of [a] class is not in fact particularly vulnerable to the crime in question,'" the enhancement cannot be based on generalizations about the class. *United States v. Zhong*, 26 F.4th 536, 564 (2d Cir. 2022) (*quoting McCall*, 174 F.3d at 150). But where a class, by its nature, is unusually vulnerable, a categorical approach might be applicable—such as where the people targeted by the scheme are *entirely* poor, uneducated, and living in helpless circumstances. *Id.* Clearly, this cannot be said about the wealthy foreign investors who were seeking U.S. visas by pouring money into a luxury hotel development project. *See United States v. Stover*, 93 F.3d 1379, 1387 (8th Cir. 1996) (people desperate to adopt children and willing to spend large amounts of money to do so were not categorically vulnerable and in need of extra societal protection). These investors were not unsophisticated peasants seeking to escape repressive regimes by jumping into leaky boats based on false assurances. Rather, they were

wealthy foreigners with substantial disposable income, seeking to buy their way into the United States.

For this enhancement to apply, not only must the government show that the victims were in fact vulnerable, but it must prove that Bob would have *known* that the victims were vulnerable. *See United States v. Kerley*, 544 F.3d 172, 180 (2d Cir. 2008). Yet, here, the investors each certified in their investment applications that they could afford to lose the entirety of their investment *and* provided SARC with proof of their wealth. Thus, not only would Bob have had no reason to know that the investors here were vulnerable—and there is no proof in the record that they were—but he had every reason to believe the exact opposite. Accordingly, the vulnerable victim enhancement should not apply.

All totaled, Bob's guidelines level should be 33 prior to the adjustment for acceptance. After acceptance, the non-binding sentencing range should be 97-121 months imprisonment.

In regard to this guidelines bracket, according to U.S. Sentencing Commission data:

During the last five fiscal years (FY2018-2022), there were 131 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 30 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 130 defendants (99%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 72 month(s) and the median length of imprisonment imposed was 72 month(s). For all 131 defendants in the cell, the average sentence imposed was 71 month(s) and the median sentence imposed was 72 month(s).

However, when further parsed, U.S. Sentencing Commission data shows that, for all defendants over 60 convicted of fraud and sentenced under 2B1.1 in the District of Connecticut, the average *and* mean sentences were approximately **27 months of imprisonment**, with less than 10% of the defendants receiving sentences of 60 months or more (*see* https://ida.ussc.gov/analytics/saw.dll?Dashboard):



Thus, while Bob's guidelines range may provide for a recommended, non-binding sentencing range of 97-121 months, actual sentencing data shows that a more appropriate and typical sentence would be in the neighborhood of 27 months (without any consideration for cooperation).

### 2. Section 3553(a) Sentencing Factors

The Court's well-known role at sentencing is to impose a sentence "sufficient, but not greater than necessary" to serve the purposes set forth in 18 U.S.C. 3553(a). The factors to be considered must include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines …

(5) any pertinent policy statement …

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Here, the fraud involved millions of dollars and—undeniably—was serious. But, as explained above, Bob did not set out to run the Palm House project into the ground and permanently deprive the investors of their funds. Rather, Bob foolishly and selfishly sought to have his cake and eat it too—hoping to use investor funds for his own benefit while still developing a world-class hotel. What he did was wrong and harmful. But it was not a classic take-the-money-and-run fraud. Even had Bob not been prosecuted criminally for his actions, his approach to the project was bound to, and did, result in his own financial ruin. It was an ill-conceived scheme from the start, made from equal parts of hope, optimism, and greed.

The seriousness of his crime, however, must be balanced against Bob's overall life story. At age 65, Bob has never before been charged with a crime and, certainly, has never served a prison sentence. As revealed by the many letters submitted to the Court, there is a side of Bob that is generous, kind, giving, and caring. And that is the part of Bob that now dominates his life and thinking. Said differently, in 2013, Bob was overwhelmed with a desire to win back the life he had lost in 2009. It took Bob's second fall from grace for him to realize that his old lost life was not worth much at all, in comparison with what he has since lost. And it was this new loss—and truly hitting rock bottom—that has allowed Bob to develop and fully appreciate the

other side of his life: the part that compels him harness his optimism and enthusiasm to touch the lives of those around him.

Given Bob's age and current life circumstances, any term of imprisonment would sufficiently promote respect for the law and provide deterrence. It is hard to imagine any unimpassioned onlooker thinking that sentencing a 65-year-old man, who has had extreme health issues and is now destitute, to a term of imprisonment of two or more years is not a serious sentence, to be avoided at all costs. When Bob emerges from prison, he will have a felony record, will be older than most anyone looking for employment, and will be without a home or money. Indeed, a sentence of 27 months, would place him exactly on the mean and median of offenders like him, and any sentence below 59 months would place him in the same category as ***ninety percent*** of the offenders in Connecticut over the past eight years.

Further, a sentence of imprisonment is not necessary to protect the public or provide needed educational training. During his extended time on pretrial release, Bob has been a model probationer and not engaged in any wrongdoing, thus proving he has clearly, and painfully, learned his lesson. While Bob does not need educational training, as noted by Probation, he would benefit from the RDAP program and drug abuse education in prison, which should be recommended by the Court at sentencing. PSR 162-163, 168-169.

Last, in regard to sentencing disparities, it must be noted that Bob's codefendant, Les Evans, received pre-trial diversion and, thus, no jail sentence or criminal record, despite his substantial involvement in the fraud scheme. Similarly, the government has not even bothered to prosecute Joe Walsh, who was at least as criminal responsible as Bob, if not more. Further, Nicky Laudano, who was involved in Bob's fraud and money laundering scheme, was recently

sentenced to probation. While these codefendants (or non-defendants) stand in different shoes that Bob, their sentences—and non-prosecutions—must be considered by the Court as a reference point at sentencing.

**Conclusion**

Bob accepts full responsibility for his crime, and has suffered greatly as a result of his wrongdoing. At 65, Bob stands before the Court facing the prospect of, effectively, a life sentence. Given the circumstances of his criminal conduct plus who Bob is as a person, a sentence consistent with the mean/median sentence imposed for like-offenders in the District of Connecticut would be sufficient, but not greater than necessary, to serve the interests of justice. Thus, he respectfully requests a sentence of 27 months of imprisonment.

                        Respectfully submitted,

                        */s/ David A. Ring*
                        David A. Ring (ct14362)
                        WIGGIN & DANA LLP
                        265 Church Street
                        New Haven, CT 06508-1832
                        T: 203-498-4377
                        F: 203-782-2889
                        dring@wiggin.com

                        *Attorney for Mr. Matthews*

## CERTIFICATION

This is to certify that on this date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by electronic mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

*/s/ David A. Ring*
David A. Ring (ct14362)