UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

        v.                       Crim. No. 3:18-CR-48 (VAB)

ROBERT V. MATTHEWS             July 24, 2023

## GOVERNMENT'S SENTENCING MEMORANDUM

For approximately a decade, the defendant, Robert Matthews, was a grifter:

- In 2007 he perpetrated a bank fraud centered on the Point Breeze Hotel in Nantucket, Massachusetts, in which he represented that loan money from TD Bank would be used on the development of the hotel and he instead used the money on himself. When the defendant defaulted, TD Bank was owed $34 million. After TD Bank foreclosed on the hotel, it was owed a deficiency of approximately $12 million.

- In 2009 and 2010, the defendant along with two others frustrated TD Bank's attempts to recover the $12 million dollars by stymying a foreclosure at another Matthews property located at 11 Cliff Road in Nantucket .

- In 2012 and through 2018, the defendant along with others utilized the Palm House Hotel to fraudulently obtain money from foreign investors – real individual people – that he spent on himself.

- In 2014, the defendant utilized money from the Palm House Hotel to perpetrate a bank fraud against JPMC by which he purchased his home located at 115 Lower Church Hill Road, in Washington Depot, CT from foreclosure using various shell entities.

- Also in 2014 – once he owned the property located at 115 Lower Church Hill Road free and clear – he took out a loan against the property for which he received cash, essentially laundering money through the property.

While running these various scams, the defendant evaded at least $2,750,000 in tax, penalties and interest based on his failure to pay taxes in 2005 and 2007. Using shell companies and bank accounts in the names of other people, the defendant put real property, personal property, and cash assets beyond the reach of the Internal Revenue Service.

These frauds were widespread and brazen. The defendant must be held to account for these crimes. The Government therefore requests a sentence consistent with the purposes of a criminal sanction.

## I.        FACTS AND CIRCUMSTANCES OF DEFENDANT'S CONDUCT

### a.        Overview

Although the defendant's relevant misconduct begins as early as his failure to pay taxes on income in 2005, the Government's indictment in this matter was focused on two primary areas: (1) the defendant's fraud perpetrated at the Palm House Hotel located at 160 Royal Palm Way, Palm Beach, Florida ("PHH") in which he stole money provided by individual foreign investors who believed their money would be invested in the PHH (the EB-5 investors); and (2) the bank fraud perpetrated against J.P. Morgan Chase ("JPMC"), in which the defendant and his coconspirators used EB-5 investment money and shell companies to maintain control of the property located at 115 Lower Church Hill Road Washington Depot, CT through foreclosure.

In short: the defendant along with his coconspirators misused millions of dollars of investor money that had been earmarked for use to develop the PHH. Rather than use the EB-5 funds to develop the property, the defendant and his coconspirators used the money for personal reasons,

including: paying off loans, saving homes from foreclosure, buying a yacht, opening pizza restaurants, and to pay for their general living expenses.  The fraud was widespread.

    **b.**  **Wire Fraud and the Palm House Hotel**

        **i.**  **EB-5 Funding, the Palm House Hotel, and the Defendants' Misrepresentations**

The PHH project was an EB-5 visa project. The EB-5 visa program was a federal program by which a foreign national would be able to obtain a green card if two primary criteria (amongst others) were satisfied: (1) a $500,000 investment in a project in the United States that (2) ultimately employs ten or more individuals. If both criteria were satisfied, the foreign national would be entitled to a green card.

Various entities in the United States act as middlemen between potential foreign investors and investment projects. South Atlantic Regional Center, or SARC, was one such entity based in Palm Beach Florida. SARC was owned and operated by an individual named Joseph Walsh. SARC's primary function was to collect funds from foreign investors that are earmarked for certain development projects and distribute them to the respective development projects. One investment project advertised by SARC was the Palm House Hotel. The defendant was the developer running the Palm House Hotel project.

The defendant had a long history with the PHH. He initially purchased the property in 2006 for $29,000,000 through private lending from a company owned by Glenn Straub. Straub foreclosed on the Palm House in 2009.  In 2013, the defendant reacquired the Palm House through an entity called Palm House, LLC by obtaining another mortgage of $27.5 million from a company owned by Straub. Notably, the defendant's brother Gerry Matthews was listed as owning 99% of Palm House LLC along with another individual named Ryan Black, who owned 1% for securing

additional financing.[1] The defendant – who at the time owed back taxes, penalties and fees to theIRS – on paper did not control the company at all. During the process of reacquiring the Palm House, the defendant connected with Walsh, SARC and EB-5 funding in 2012.

The defendant represented himself as rich and famous in the EB-5 investment documents. They contain pictures of the defendant with Donald Trump and statements that the PHH would be an exclusive resort location and attract celebrities based on the fame of the defendant's wife, Mia Matthews. Specific instances of misrepresentations include the following:



In this section of promotional material circulated to the foreign investors, the defendant represented that he had $22 million dollars in equity in the Palm House Hotel. In fact, Robert

---

[1] Gary Matthews does not appear to have been aware that he was listed as 99% owner of Palm House LLC until October 2014.

Matthews did not own the property at all. Instead, Glenn Straub owned the property. EB-5 investor money was used to purchase the property from Mr. Straub. There is no indication, however, that Mr. Straub was aware of the numerous misrepresentations to the investors.



In this section of promotional material that was circulated to prospective foreign investors there was a heading entitled "World Renown Advisory Board." Under that heading are pictures of Donald Trump and the Matthews as well as Bill and Hillary Clinton with the Matthews. The text states "our advisory board will assist in branding the Palm House as a desired destination hotel and frequented by wealthy around the world." In fact, neither Donald Trump nor the Clintons were on the advisory board.

**Q16. Can a list of names be provided for the future members of the Palm House Club?**

Due to the exclusive nature of the Palm House Club no list of names can be furnished. The Rich and Famous want privacy and we must facilitate their desire as such.

可提供棕榈渡假屋项目未来会员具乐部的名单列表吗？
由于关乎富商和名人的隐私问题，棕榈渡假屋项目必须要尊重他们，不能对外提供会员具乐部的名单列表。

However, we do know that such luminaries as Multi-Billionaire Bill Koch, of Koch Industries; Eric Schmidt, Chairman of Google; Tony Bennett, of song and stage; Celine Dion, one of the most famous signers in the world; and President Bill Clinton will be a part of the club.

不过，我们知道亿万富翁科克工业集团 – 比尔科赫；谷歌董事长 – 埃里克·施密特，著名舞台歌手 – 托尼·贝内特；在世界上最有名歌手之一 – 席琳·迪翁；前总统 – 比尔克林顿；都将成为具乐部的会员。

In this PHH FAQ that was posted on the SARC website, the defendant represented that several famous individuals would be a part of the Palm House Club. In fact, none of these individuals planned to be members or investors in the PHH. Relatedly, one witness, recounted that the defendant provided him with a list of wealthy people that he said were joining the club to persuade him to invest in the project. When law enforcement spoke to those individuals, they all denied that they were joining the club. They related, however, that the defendant had told them that the witness was joining the club in an effort to get them to invest.

Beyond these, there were numerous other misrepresentations, including the following:

- In the private placement memorandum issued to EB-5 investors dated December 2, 2012, Gerry Matthews was listed as a part of the Palm House, LLC management team. In fact, although Gerry Matthews was a 99% owner of the LLC that owned property, it was in name only. Gerry Matthews was not even aware he was the 99% owner until October 2014.

- In the loan documents executed between Palm House Hotel, LLLP (the SARC entity) and Palm House, LLC (the Robert Matthews entity) governing the transfer of funds between the two entities, numerous representations were made, including that the proceeds of the loan would be used for Palm House LLC to develop the project in Florida and that the proceeds would be used for purposes set forth in its business plan, including purposes related to job creation, and purchases of furniture, fixtures, and equipment.

- The defendant also included a broker fee in the transaction to purchase the property from Mr. Straub, which resulted in an increase in the purchase price of $1.8 million dollars, which went to Robert Matthews. That cost was borne by the EB-5 investors. In fact, there was a broker in name only, and Robert Matthews pocketed most of the fee.

In reliance on these misrepresentations, EB-5 investors began to send their money to SARC to invest in the PHH. Millions of dollars of EB-5 funding began to come in from around the world, including countries such as China and Iran. These moneys were deposited into a SARC LLC bank account at PNC bank controlled by SARC and Walsh. Walsh would then transfer the money into a bank account owned by Palm House Hotel LLLP, which was also a SARC entity. From there,

the money would go to an account owned by an entity called 160 Royal Palm LLC, which is a subsidiary of Palm House LLC, either directly or through Leslie Evans' Interest on Trust Account ("IOTA account"). Evans and Matthews' assistant Jade Yu were the signatories on the 160 Royal Palm LLC account. Walsh and his entities distributed approximately $30 million to the entities controlled by the defendant for purposes of contributing to the development of the PHH. The illustration below demonstrates the flow of funds.



All of the money in the 160 Royal Palm LLC account at Regions Bank was dedicated EB-5 money under Robert Matthews' control. There were approximately 61 EB-5 investors in the Palm House Hotel, who each invested at least $500,000. Thus, the overall loss to these investors was at least $30,500,000.

### ii. Misappropriation of EB-5 Funds

The defendant and his coconspirators misappropriated moneys earmarked for the PHH. Once Robert Matthews had this money under his control in either the IOTA Account or the 160 Royal Palm Account as described above, he spent it on his and his wife's lifestyle.

Robert Matthews, through his agents, moved money into and through a number of accounts, including four accounts controlled by Laudano, one controlled by Gerry Matthews, and two accounts in the name of companies called Mirabia LLC and Bonaventure 22 LLC. Mia Matthews owned both companies and was the signatory on the accounts associated with these companies.

The Matthews spent money for personal purposes directly out of the Mirabia LLC and Bonaventure 22 LLC accounts. The Matthews also purchased multiple properties in Connecticut with EB-5 funds that flowed through these accounts, including 1) 105 Lower Church Hill Road in Washington Depot, Connecticut and 2) 115 Lower Church Hill Road in Washington Depot, Connecticut. Robert Matthews also directed Evans, Laudano and Jade Yu to move money to Gerry Matthews' account in Connecticut and directed Gerry Matthews to move the money to various accounts, including the Mirabia and Bonaventure accounts, as well as to pay the Matthews' credit card debt. The Matthews also spent EB-5 money lavishly in Florida, including purchasing a yacht called "the Alibi" with EB-5 money, buying a $5.3 million-dollar home outright, paying local taxes with EB-5 money, and purchasing multiple vehicles, including a Maserati. On two occasions, Robert Matthews used EB-5 investor funds to pay back a personal loan he owed an individual named Lawrence Moens without passing through a personal bank account.

### c.  **Bank Fraud centered on 115 Lower Church Hill Road, Washington Depot, CT**

The property located at 115 Lower Church Hill Road was also the locus of a bank fraud perpetrated by the defendant. The defendant purchased the property, along with a nearby vacant lot in 2001 for $3.9 million. The purchase was initially financed with a $2,000,000 mortgage, a $400,000 line of credit and a second $375,000 line of credit, all from Merrill Lynch. In May 2004, Robert Matthews refinanced 115 Lower Church Hill Road with Washington Mutual Bank for $3,600,000, which was later assigned to JPMC. Robert Matthews sought to refinance the property again in June 2008. In September 2013, JPMC foreclosed on the loan and took ownership of the property.

The defendant conspired with Laudano and others to misuse EB-5 money and defraud JPMC by executing a plan to purchase 115 Lower Church Hill Road back at a discount at the

foreclosure sale through a straw entity that would conceal the defendant's involvement in the transaction as well as the source of funds.

Jade Yu, Matthews' assistant, stated the following in an SEC deposition:

- From 2013-2014 Yu was employed as the executive assistant and controller of 160 Royal Palm, LLC.

- The defendant told Yu that he lost the house due to a failed project and that he wanted to get the house back because his family had an emotional attachment to it.

- Upon seeing that it was up for sale at a foreclosure auction, the defendant told Yu to register for the auction and open an account for the purpose of getting the house back.

- The defendant instructed Yu and/or Laudano to create a Delaware entity called NJL Development Group for the specific purpose of reacquiring 115 Lower Church Hill Road for the defendant.

- The defendant told Yu to make sure that between Laudano and her one of them succeeded in getting the house.

On February 1, 2014, Mr. Laudano's company, NJL Development Group, LLC, was awarded the property with a winning bid of $2.59 million. NJL Development Group, LLC was incorporated two days later in Delaware on February 3, 2014.

On February 3, 2014, Matthews' attorney Evans sent the following to the auction company representing the bank:

This email shall confirm that our firm is in receipt of cleared funds in the amount of $2,750,000.00 from Nick Laudano/NJL Development Group, LLC. As part of said transaction, we will be wiring the amount of $136,237.50 to Bendett Mchugh today.

Please call should you need anything further.

Regards,

Leslie Robert Evans

This statement was false. At no point before or after this time did Laudano or NJL Development Group, LLC send $2,750,000.00 to Evans' account. Nor, "as a part of said transaction," did Evans wire $136,237.50 to Bendett McHugh, because no such transaction existed. Although Evans did wire $136,237.50 from his IOTA account to an account controlled by Bendett & McHugh that day, the source of that money was other clients' comingled funds in his IOTA account.

On February 23, 2014, Laudano executed a sales agreement with JPMC. It stated that JPMC had the right to terminate the agreement if Laudano was either the former mortgagor of the property or was related to or affiliated in any way with the former mortgager and there was no disclosure. Laudano did not disclose his affiliation with the defendant to JPMC.

On April 2, 2014, Laudano opened an account at First Bank of the Palm Beaches in the name of New Haven Contracting South. On April 29, 2014, the defendant directed $2.655 million of EB-5 investor funds to be wired from the account for 160 Royal Palm LLC to the New Haven Contracting South account. In the weeks prior to April 29, 2014, the defendant had received multiple million-dollar wires from SARC into the 160 Royal Palm LLC account.

On April 30, 2014, Laudano opened another account in the name of NJL Development Group at First Bank of the Palm Beaches. The same day, Laudano transferred the $2.655 million

11

to this newly opened account.  Laudano then wired $2.601 million to a Connecticut bank account owned by the law firm Minnella, Tramuta & Edwards, LLC at Webster Bank.  This law firm represented Laudano at the closing.  That same balance was wired to Bendett & McHugh, JPMC's attorneys handling the closing.

Laudano wired the remaining approximately $50,000 to a savings account in the name of Matthews Commercial Properties – Gerry Matthews' company.

Below is a chart that follows the flow of EB-5 investor funds from SARC to the purchase of 115 Lower Church Hill Road. The quotations next to a transaction is what appeared in the memo line of the outgoing wires.



As a result of these transactions, NJL Development Group, LLC owned the property free and clear. Additionally, a tax lien that had been filed against the property was discharged; the lien itself was filed against Robert and Maria Matthews and was automatically attached to any property owned by them.

i. **Illegal Monetary Transactions based on Loan against 115 Lower Church Hill Road**

Finally, in connection with the 115 Lower Church Hill Road property, Laudano, the defendant, and his wife Mia Matthews, took out a loan secured by the property located at 115 Lower Church Hill Road from an individual named Keith Mahler in November 2014.

On November 24, 2014, two disbursements came from an attorney's account in Connecticut to two different Laudano accounts, including more than $1,000,000 to an account controlled by NJL Development Group Inc. and $140,000 to New Haven Contracting South. This money then passed through various Laudano accounts, including some related to the now closed Ah-Beetz pizzeria located in New Haven, Connecticut before finally being deposited in the Mirabia LLC account under the Matthews' control. Two wires came out of the Mirabia account to a law firm called Rogin Nassau LLC that helped Robert Matthews purchase property in Connecticut.

The following chart shows the movement of this money.



### d.  Additional Matthews Misconduct

As described at the outset, the defendant engaged in additional fraudulent misconduct dating back to 2007. In particular, a fraud involved Point Breeze Hotel in Nantucket, RI and a subsequent frustration of the defrauded bank's attempts to recover money from a foreclosure at 11 Cliff Road in Nantucket.

### i.  Point Breeze Hotel

Beginning in December 2007, the defendant and others perpetrated a bank fraud whereby they represented to TD Bank that the proceeds of a construction loan would be used for the

development of the Point Breeze Hotel in Nantucket, Massachusetts. The loan was worth more than $40.6 million dollars, and was secured by the hotel itself, as well as with second mortgages on two other Matthews-owned properties, including the property at 11 Cliff Road, which the defendant used as a private residence. The loan was not paid out all at once, but instead was drawn down gradually upon request by the defendant. To initiate a draw down, the defendant had to periodically submit affidavits to the bank for the bank to release the proceeds, which stated, inter alia, "All costs shown in all prior requests for advance have been paid in full." In fact, the defendant used significant portions of the proceeds for his own purposes unrelated to the Point Breeze, and regularly failed to pay subcontractors for work performed. For instance:

- On January 18, 2008, he sent money to a company called Triple F of New Haven LLC, which held a $7 million mortgage on the property at 11 Cliff Road and to a company called Wallace Capital LLC d/b/a WPC Point Breeze, which held a $3.5 million mortgage on the same property. Both mortgages were discharged.

- Two employees also recounted that disbursements that came in from TD Bank went down to the defendant's Florida offices where they were disbursed to other projects, including the PHH.

When Robert Matthews ultimately defaulted, TD Bank was owed $34 million on the loan. It foreclosed on the Point Breeze in 2009 for $22 million. Following the Point Breeze foreclosure, TD Bank had a deficiency judgment for approximately $12 million, which it then sought to enforce against the property at 11 Cliff Road based on its second-position lien.

### ii.  11 Cliff Road

As described above, TD Bank sought to enforce its deficiency judgment against the property at 11 Cliff Road after it foreclosed on the Point Breeze Hotel.  At the time, TD Bank was

the second-lien holder. Washington Mutual, which around this time was purchased by JPMC, held the first-position lien based on an earlier mortgage taken by the defendant. The defendant was behind on his payments on that loan, and, as a result, JPMC was in the process of foreclosing on 11 Cliff Road.

Against this backdrop, Matthews and others schemed to mislead TD Bank out of the fair value of its second position note on 11 Cliff Road, by misleading it into selling the note to for $100,000 (or pennies on the dollar) based on the false understanding that JPMC would soon foreclose on its first position and extinguish TD Bank's interest. In fact, the defendant – working with others – brought JPMC's mortgage to current through a private loan. The aim of this scheme was to (1) enable the defendant to continue to own the house through the use of a straw purchaser – TD Bank would not have engaged in a transaction where the defendant got to keep the house or where straw purchasers were used; and (2) to prevent TD Bank from foreclosing on the property by bringing the first position current and thereby allowing the defendant to maintain it. TD Bank would not have sold its position for $100,000 if it had known that there was a plan in place to bring the first position current and thereby allowing the defendant to continue to own the property

### e.  Tax Evasion

Finally, the defendant also attempted along with his wife to evade at least $2,750,000 in federal taxes, penalty, and interest for the years 2005 and 2007. As recounted in the PSR, the defendant:

- Repaid loans using EB-5 investor money without placing the money in a personal account and thereby evading liens and levies that would otherwise attach. PSR ¶¶ 42–45.

- Purchased the property at 115 Lower Church Hill Road through the use of a shell company thereby extinguishing a federal tax lien that automatically attached. PSR ¶ 46.

- Sold a Mercedes after receiving a notice that his assets would be seized and putting the money received from that sale into Evans' IOTA account. PSR ¶ 47.

- Repaid more than $5 million in local tax bills on his property without placing the money in a personal account and thereby evading liens that would otherwise attach. PSR ¶ 48–51.

- Used his brother Gerry Matthews' business bank account to hide money from creditors and to pay for personal expenses. PSR ¶¶ 52–53.

- Used a shell company owned by his wife to spend more than $450,000 of EB-5 investor money to purchase a property located at 105 Lower Church Hill Road. PSR ¶ 54.

- Used shell companies along with his wife to take out loans against the properties at 115 Lower Church Hill Road and 105 Lower Church Hill Road. PSR ¶ 55–56. The defendant and his wife also sold the property at 105 Lower Church Hill Road and placed the money into company accounts and accounts in the name of their children. PSR ¶ 57.

- Caused $1,142,607.11 in insurance proceeds resulting from flood damage to his personal residence at 115 Lower Church Hill Road in Washington, CT to be deposited into a business account in his control, or into his brother's (Gerry Matthews) business account for Matthews' personal use.

Stated differently, the defendant and his wife moved *millions* of dollars through shell companies, properties, and accounts in the name of other individuals to evade their multi-million-dollar tax liabilities.

At the time he was indicted he had not filed a federal income tax return since 2009 and had not made a single voluntary payment against his tax liabilities.

## II.    <u>SENTENCING GUIDELINES</u>

The Government concurs with nearly all of probation's calculation of the sentencing guidelines.[2] In particular, the base offense level is 7. PSR ¶ 74. A 22-point enhancement applies because the loss amount was between $25,000,000 but does not exceed $65,000,000. *Id.* The fraud involved ten or more victims, so an additional two-point enhancement is warranted. *Id.* Two additional points are warranted under the "sophisticated means" enhancement. *Id.* This results in an offense level of 33. PSR ¶ 74. Because the victims were vulnerable, an additional two-point enhancement is warranted. PSR ¶ 76. Two more points are added because the defendant was an organizer or leader. PSR ¶ 77.  The adjusted offense level is therefore 37. After grouping with the other counts. The combined adjusted offense level remains 37. Three levels are subtracted for acceptance of responsibility, which results in a total offense level of 34.

Without a criminal history, the resulted guidelines imprisonment range is 155 to 188 months.

For his part, the defendant believes that the loss amount is overstated, and that the vulnerable victim enhancement ought not to apply. Neither argument has any merit.

---

[2] The Government concedes that the gross receipt enhancement ought not to apply to the defendant for the bank fraud as described in the PSR. Notably, however, the Point Breeze Hotel involved a bank fraud that did involve gross receipt of more than $1,000,000. And although that loss is not counted under the guidelines as relevant conduct, it is relevant information that the Court can consider under the 3553(a) factors.

a.  **Offsets**

The defendant first contends that because the victims were paid money in the bankruptcy proceeding as if they had been secured creditors, they ought to be treated as though they were secured creditors at the defendant's sentencing per U.S.S.G. § 2B1.1 note 3(e)(ii). This despite the fact that they were not, in fact, secured creditors. The defendant should not obtain a benefit because a bankruptcy judge acted justly in how he decided to treat the victims in this matter.

U.S.S.G.  § 2B1.1 note 3(e)(ii) provides that:

> Loss shall be reduced by the following . . . [i]n a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

The undisputed facts here are clear: the EB-5 investors had no secured interest in the property. Nor did the defendant provide any collateral to the investors. They were "partners" in an entity over which they exercised no control – Palm House Hotel LLLP. That entity was purportedly granted collateral in a company called Palm House LLC. One of Palm House LLC's holdings was 160 Royal Palm, which was the holding entity of the Palm House Hotel. No collateral was pledged or otherwise provided by the defendant to the victims. On its face, the application note does not apply.

Additionally, the mere fact that the bankruptcy judge decided to treat the investors as though they were secured investors, does not mean that they were. Indeed, the Government understands that the bankruptcy court explicitly found that the investors did not have a security in the property. *See* https://www.palmbeachdailynews.com/story/lifestyle/real-estate/2019/03/09/palm-beach-hotel-project-bankruptcy-judge-approves-palm-house-sale-for-nearly-40m/5754307007/ ("In his ruling, [the bankruptcy judge] said those involved 'acted in good faith' in negotiating a sale to achieve 'the best possible' outcome to help satisfy Palm House

creditors and investors. The latter include dozens of foreign nationals who claim they lost 'tens of millions of dollars' through their investments when the Palm House project derailed, Kimball said. The court considers the investors' claims, however, as "unsecured" by the property."); *see also In re* 160 Royal Palm, LLC, Bank. Pet. No. 18-19441-EPK (Doc. No. 619) (order granting sale plan). Instead, the judge acted equitably in approving a plan that would see some repayment of their investment. That decision was also the subject of an appeal. *See id.* (Docs. No. 644 and 645).

Therefore, the defendant is not entitled to a credit against loss amount per U.S.S.G.   § 2B1.1 note 3(e)(ii).

### b. <u>Vulnerable Victims</u>

The defendant's argument that the victims were not vulnerable is also without merit. Section 3A1.1(b) provides a two-level enhancement if "the defendant knew or should have known that a victim of the offense was a vulnerable victim." A "vulnerable victim" is one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." 3A1.1(b) note 2.

The defendant is correct in his contention that determining whether this enhancement applies turns on whether the individual victims' ability to avoid the crime. *See United States v. McCall*, 174 F.3d 47, 51 (2d Cir. 1998). Here the victims were foreign nationals, many of whom did not have access to the United States and did not intend to spend money traveling to check on the status of their investment. They were entirely dependent upon Walsh, Matthews and others for their investment to be successful. Their remoteness is what made them vulnerable. It is also the reason they were targeted.

During the pendency of the scheme the defendant may have been able to write-off the victims as nameless foreign oligarchs looking to buy their way into the United States, the reality

is more complex. At least some of the victims were real people looking for a piece of the American dream. Many sought to follow their children who were studying in the United States. Some sold property in order to invest in the PHH. Their victim impact statements are attached as exhibit A, and they paint a portrait of the hardship the defendant and his conspirators caused.

C.R. wrote that she and her husband had long planned for their daughter to go to America for a better education and to live in "an environment that has more democracy, liberty, and equality." C.R. was preparing to live in the United States with her daughter. Because of the fraud, that dream has been thwarted. C.R. instead has sent her daughter to Australia to study and is now separated from her. Three years of COVID has exacerbated the problem, and the cost of the fraud nearly prohibited the family from being able to send their daughter to study abroad. Moreover, the family has spent eight years in litigation, which has resulted in lost time and energy and attorneys' fees.

L.C. also decided to apply for her daughter's education. L.C. sold a house to invest in the PHH. As a result, L.C. has had to live frugally to save money and has resorted to take out loans to cover the costs of her daughter's education. She writes that her "life has been on the verge of collapse multiple times in recent years."

L.D. wrote that the fraud has turned his family's work, life, and study plans into chaos. To raise funds, he had sold the housing in which his entire family lived for less than market value. His wife had resigned from work, which represented lost income, in anticipation of living abroad with their daughter who planned to study in the United States. Likewise, he took a pass on promotion opportunities.

F.J. wrote that the defendant's actions affected his child's study plans. He lamented that his child was "supposed to have a happier childhood but must endure the heavy pressure within

the system now." He also wrote that the failed immigration attempt "brought great economic loss that directly affected our daily consumption and life." Even if his family wanted to try and apply for a visa again, they are now "powerless to do that" – ostensibly because they can no longer afford to do so.

Another victim who wished to remain completely anonymous wrote that the investment "significantly altered our life track, especially the children's" and that the "physical and mental loss are immeasurable."

W.Y. wrote that he had a "love of American culture" and a yearning to be in the American workplace. With the help of his family, he decided to acquire a green card via investment "to realize the dream and goal of staying in America to work and live." Because he had just graduated, he had to rely upon family, who provided him with the money because they "thoroughly understood [his] desire to stay in America eagerly and [his] beautiful vision." W.Y. states explicitly that it took many years for his family to save the money he invested. W.Y. wrote that he has endured a decline of quality of life as well as a feeling indebtedness to his family. The fraud also "totally mess[ed] up [his] career" and "shaken up the trust [he] has in the US nation and its people."

C.R. also sold property in order to invest. His family "suffered a severe blow mentally and miserably."

These victim statements paint a more complex picture than simply "wealthy foreigners with substantial disposable income, seeking to buy their way into the United States." Def't Mem. at 14–15. To the contrary, the victims sound much like domestic victims of white-collar frauds that the Government and the Court hear from all too frequently. That they also sought a better life for themselves and their children and were willing to invest money to do so should not be held

against them. To the contrary it is illustrative of exactly how vulnerable they were (and what they were willing to do) to have a better life.

Finally – the argument that the defendant did not know that the victims were vulnerable because he thought they were wealthy is without merit. *See* Def't Mem. at 15. It was not their lack of wealth that made them vulnerable. It was their remoteness and inability to detect any fraud that made them vulnerable. It was their desire for a better life and a better life for their children in the United States that made them vulnerable. There is no dispute the defendant was aware that the EB-5 investors were foreign nationals who sought a green card in the United States.

The enhancement ought to apply.

## III.   SENTENCING FACTORS

The serious nature of this crime calls for a sentence consistent with the purposes of a criminal sanction as described by 18 U.S.C. § 3553(a).

### i.   The Nature and Circumstances of the Offense, the Seriousness of the Offense, and Just Punishment

The most significant consideration that augurs for punishment in this case – and one that is only briefly touched upon in the defendant's sentencing memorandum – is the seriousness of the offense and the victim impact. This is not a case where the defendant made a single mistake or exercised bad judgment on an isolated incident. Instead, the defendant executed multiple multi-faceted scams that involved dozens of victims – banks and individuals alike – across ten years in amounts totaling in the tens of millions of dollars. The EB-5 money belonged to real people who had worked hard to earn it as reflected in their victim impact statements.

### a.  **Victim Impact**

Any discussion about the seriousness of the offense must begin with the victims. To be clear, unlike some white-collar cases, the victims here include actual people. This scam has had a traumatic impact on the victims in this matter, in multiple ways.

**First,** the victims suffered sever financial loss. As described above and is apparent in Exhibit A – each of the victims invested *at least $500,000*. There were more than 50 victims. That is an enormous sum of money. And there were real consequences for the victims as well, which are described in their victim impact statements.

**Second**, the victims also suffered a significant betrayal of trust. As described in their statements, many were enamored of the United States of living here. The victims sought the opportunity to come, work, live, and make a better life for themselves here. Their hope was preyed upon by the defendant.

**Third**, and relatedly, as a result of the defendant's fraud, not only did some investors lose money, but they lost the opportunity to apply a second time as they could no longer afford to do so.

### b.  **Nature of the Frauds**

The seriousness of the offense can also be measured by the nature of the various frauds the defendant perpetrated.

And to be clear – there were multiple frauds. As recounted above, across approximately ten years, the defendant: (1) perpetrated a fraud against TD Bank based on the Point Breeze Hotel; (2) frustrated TD Bank's attempts to recoup those losses; (3) perpetrated the PHH fraud; (4) perpetrated the fraud focused on 115 Lower Churchill Road; (5) laundered money from those transactions; and (6) evaded taxes through the use of other individuals and shell companies. All

the while, the defendant lived in a beach-front 12,000 square foot mansion located at 101 Casa Bendita, Palm Beach, Florida. He was also able to purchase properties in Connecticut and spend money lavishly to support his and his wife's lifestyle. The breadth of the defendant's fraudulent activities calls for a lengthy term of incarceration.

Additionally – unlike some frauds – the PHH fraud was a scam from the outset. The defendant lied to obtain the very first dollar he received from the EB-5 investors. As recounted above, the initial marketing materials contained misrepresentations about who would be a part of the club and who worked on its advisory board. These statements were not true at the time the defendant included them in those materials. The defendant, who by this time had perpetrated the fraud at the Point Breeze Hotel, saw a new opportunity for grift and took it.

The seriousness of the frauds' nature can also be measured by its complexity. The defendant used multiple shell companies to perpetrate the fraud. The defendant used accounts in other individuals' names to move money, including his brother's accounts, his wife's companies, and his attorney's IOTA account. The defendant did this knowingly – he told his brother that he had done this explicitly to avoid creditors. The defendant also cleverly used hard-money lenders and shell companies to wring money from properties that he would otherwise have lost in foreclosures or been subject to liens. For instance, in the case of 115 Lower Church Hill Road, he orchestrated a transaction in which a shell company ended up purchasing the property out of foreclosure that he continued to use for his benefit. The IRS lien that had attached to the property was extinguished in the process. Once it was owned free and clear, he took out a loan from Keith Mahler that was secured by the property that resulted in money he was able to use to continue to support his lifestyle.

Stated succinctly, the frauds the defendant perpetrated were widescale, long-lasting, and had serious consequences for the people who suffered as a result. Any sentence imposed by the Court needs to account for these facts.

### ii.   History and Characteristics of the Defendant

The Government acknowledges that the defendant has no criminal history and is sixty-five years old. These facts, along with his success while on pretrial release and others, are certainly mitigating factors the Court can and should consider in crafting a sentence.

However, the fact remains that for more than a decade, the defendant perpetrated multiple frauds, at least one of which – the PHH fraud – was a fraud from the outset. These facts also paint a darker picture of the defendant and his characteristics. His willingness to engage in these sorts of frauds time and again speak to his character.

Moreover, this Court is called upon regularly to sentence defendants, many of whom often come from impoverished backgrounds and crime-addled neighborhoods where the only way out appears to be selling drugs. The defendant, by contrast, grew up all around the world. PSR ¶ 110. And while his father was "distant," "lacking in emotion," and sometimes verbally abusive,  his mother was "a wonderful person who put her family first." PSR ¶ 112. There is no evidence of physical abuse, poverty, or anything else from which so many defendants who come before this court often have suffered. *See* PSR ¶ 112. Indeed, the defendant was set-up well in life, attended college in Costa Mesa, California and launched a career as a real-estate developer. PSR ¶ 110.

The fact that the defendant was provided with so much opportunity, while other defendants who come before the Court for sentencing were provided with so little, is an appropriate factor to consider. Especially as other defendants who are provided so much less opportunity than the

defendant was given end up serving significantly lengthier sentences than even what these guidelines contemplate.

### iii.  Unwarranted Sentencing Disparities

Another factor the Court considers in connection with a sentencing are unwarranted sentencing disparities. Cases that have victims similar to those in this case actually result in quite lengthy sentences for defendants, even in the absence of criminal history and having suffered extraordinary hardship.  For instance:

- *United States v. Castellano*, 3:16-cr-65-RNC. The defendant was sentenced to 68 months' incarceration. Convicted after plea. Same loss range as here, ten or more victims, many of them close family friends and family. No criminal history and a total offense level of 23, resulting in a guidelines range of 46–57 months.

- *United States v. Vaccarrelli*, 3:18-cr-92-JBA. After trial, the defendant was sentenced to 90 months' incarceration. Fifteen victims. No criminal history. Defendant blamed alcohol abuse as contributing to the fraud. Total offense level of 33, resulting in a guidelines range of 135–168 months.

- *United States v. Hurt*, 3:14-cr-250-JBA. After trial, the defendant was sentenced to 60 months' incarceration. Defendant contributed to (but was not the lead defendant in) a fraud where 40 victims were defrauded of more than $4,000,000. No criminal history. Guidelines range of 70–87 months.

Of course, each of these cases are distinguishable in their own way. And the Government is not claiming that any of these cases are on all fours with the instant case. Instead, this sampling is illustrative of the fact that defendants in this district who perpetrate frauds that impact real people out of their hard-earned money end-up with multi-year sentences. Notably, defendants who

defraud institutions rather than people out of money with no criminal history often end up with multi-year sentences, even where they have suffered extraordinarily:

- *United States v. Mallory*, 16-cr-94-RNC. After a guilty plea, received a 21-month sentence for defrauding a bank. Defendant claimed physical and sexual abuse pushed her to perpetrate the fraud. Guidelines range of 33 to 41 months' imprisonment. No criminal history.

- *United States v. Teixeira*, 19-cr-305-VLB. After a guilty plea received a 41-month sentence for defrauding his employer. Defendant's mother killed his father and then himself resulting in serious and significant trauma to the defendant. Guidelines range of 41-51 months. No criminal history.

### iv.  General Deterrence

A lengthy prison sentence can also serve as a powerful general deterrent against the commission of future financial frauds and embezzlements and thereby better protect the public.

The author of a survey of academic research regarding the efficacy of criminal sanctions for white collar crimes found the following:

> White-collar crime is believed to be particularly amenable to deterrence due to its rational and profit-oriented motivation.  In a conceptual analysis of the topic, Braithwaite and Geis observed that white-collar offenders are not committed to a lifestyle of illegality, are risk aversive, and have more to lose as a result of a criminal conviction than street offenders.  Elsewhere Geis noted that "[j]ail terms have a self-evident deterrent impact upon corporate officials, who belong to a social group that is exquisitely sensitive to status deprivation and censure." It is generally perceived that executives exhibit distress at the thought of being sentenced to incarceration: "It results in hypertension, it causes heart attacks, it is very serious."

> Most judges and prosecutors view general deterrence as the one of the goals, if not the major purpose, in sentencing white-collar offenders. Punishment should serve to discourage others from committing

> similar offenses and jail or prison sentences, judges and scholars alike
> tend to believe, are particularly effective as a general deterrent.

Elizabeth Szockyj, "Imprisoning White-Collar Criminals?" from "Symposium: A Fork in the Road: Build More Prisons or Develop New Strategies to Deal with Offenders," 23 S. Ill. U. L.J. 485, 492 (1999) (footnotes omitted). More recently, the Second Circuit reiterated in *United States v. Cutler*, that the relative length of the sentence is an important deterrent factor in a case involving bank fraud and a related tax offense. *See* 520 F.3d 136, 162–63 (2d Cir. 2008).

## IV.   CONCLUSION

For these reasons the Government respectfully requests a sentence consistent with the aims of 18 U.S.C. § 3553(a).

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

_____/s/_____
JOHN T. PIERPONT, JR.
ASSISTANT UNITED STATES ATTORNEY
157 CHURCH STREET, 25TH FLOOR
NEW HAVEN, CT 06510
FEDERAL BAR NO. phv07973
Tel.: (203) 821-3700
Fax: (203) 773-5378
John.pierpont@usdoj.gov

## <u>CERTIFICATION</u>

I hereby certify that on July 24, 2023 a copy of the foregoing was filed electronically, sent via e-mail to defense counsel, and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____/s/_____
JOHN T. PIERPONT, JR.
ASSISTANT UNITED STATES ATTORNEY